# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

DONNA S. JUNG,                                    Case No. 1:11-cv-34
        Plaintiff                                 Barrett, J.
                                                  Litkovitz, M.J.
        vs

COMMISSIONER OF                                   **REPORT AND**
SOCIAL SECURITY,                                  **RECOMMENDATION**
        Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB).  This matter is before the Court on plaintiff's Statement

of Errors (Doc. 15), the Commissioner's response in opposition (Doc. 20), and plaintiff's reply

memorandum.  (Doc. 21).

## I. Procedural Background

Plaintiff filed her initial application for DIB on November 20, 2003, alleging disability

since January 21, 2003.  On August 24, 2006, Administrative Law Judge (ALJ) Ronald Jordan

issued a partially favorable decision, finding a closed period of disability from January 21, 2003

through March 8, 2005.  ALJ Jordan denied disability benefits after March 8, 2005, finding

plaintiff had experienced medical improvement and was able to perform substantial gainful

activity after this date.  (Tr. 58-67).

Plaintiff filed her current application for DIB in September 2006, again alleging a

disability onset date of January 21, 2003,[1] due to back and leg problems and depression.  (Tr.

123).  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff, through

---

[1] Under principle of *res judicata*, the earliest plaintiff could be found disabled is August 25, 2006, the day
after the previous non-disability decision. (Tr. 181).  *See Willis v. Sec'y of Health & Human Servs.*, 802 F.2d 870,
871 n.2 (6th Cir. 1986).  Plaintiff later amended her alleged onset date to August 25, 2006.  (Tr. 10).

counsel, requested and was granted a de novo hearing before ALJ Robert W. Flynn. Plaintiff

and a vocational expert (VE) appeared and testified at the ALJ hearing. On October 14, 2009,

the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's request for review by

the Appeals Council was denied, making the decision of the ALJ the final administrative

decision of the Commissioner.

## II. Medical Evidence

### A. Physical Impairments

Plaintiff's lower back and leg pain began in May 2000. (Tr. 184-85). Plaintiff

exacerbated her back pain in January 2003 due to a work-related injury. (Tr. 216-19).

Orthopedist, Robert Hill, D.O., diagnosed a sprain and strain of the lumbosacral spine with disc

herniation. (Tr. 404-06). A February 2003 MRI of the lumbar spine revealed herniated discs at

L4-5 and L5-S1 with mild left L5 nerve root impingement. (Tr. 221-22).

Plaintiff was initially treated with epidural steroid injections and Vicodin for pain. (Tr.

193-96, 208, 405). Treatment notes reflect that plaintiff exceeded the prescribed dose of her

medication and was upset when her refill for Vicodin was denied. (Tr. 405). In May 2003,

plaintiff underwent a lumbar laminectomy for a herniated disc at L4-L5. (Tr. Tr. 203-14, 197-

202). Despite surgery, plaintiff reported no significant change in her low back and left leg pain.

(Tr. 206, 315). A June 2003 CT/myelogram revealed only post-surgical changes and no other

significant herniation. (Tr. 235). A July 2003 EMG of the left leg was normal. (Tr. 238-39).

An MRI of plaintiff's lumbar spine was taken in January 2004 and showed disc desiccation in

the lumbar spine and disc herniation at L5-S1 that did not compress the nerve root. (Tr. 209).

Plaintiff treated with internist, Howard Schertzinger, M.D., from November 2003 through

December 2004. (Tr. 314-28). In December 2004, Dr. Schertzinger reported no dramatic

2

change after a year of treatment, with plaintiff's pain remaining at a level of four to five out of ten. (Tr. 325). He referred plaintiff to a pain specialist. *Id.*

Plaintiff treated with primary care physician, Eleia Reyes, M.D., from April 1999 to May 2009. (Tr. 248-50, 262-64, 416-19, 537-600, 651-55). In January 2007, Dr. Reyes recommended that plaintiff lose weight in order to improve her health; her weight was reported as 254.20 pounds. (Tr. 566). Dr. Reyes also reported that plaintiff was upset when she did not get the pain medication she requested. *Id.* On June 12, 2007, Dr. Reyes reported that plaintiff's weight was 253.6 pounds. (Tr. 568). On July 21, 2008, Dr. Reyes reported plaintiff's weight was 264.40 pounds. (Tr. 571). By May 7, 2009, plaintiff's weight was 259.40 pounds. (Tr. 652).

Plaintiff treated with Dr. Hill again beginning in July 2006. (Tr. 407-14). On August 30, 2006, plaintiff underwent arthroscopic chondroplasty patellofemoral joint and trochlear groove and arthroscopic extensive synovectomy of her left knee due to her diagnosis of degenerative joint disease. (Tr. 380-81). In September 2006, Dr. Hill noted that x-rays showed the knee implant was in "excellent position" and her motion was improving. (Tr. 408). The following month, Dr. Hill reported that plaintiff's knee felt good, and there was improved strength and full range of motion. (Tr. 409, 422). Dr. Hill recommended she stop physical therapy and continue with home exercises. *Id.*

An MRI in October 2006 showed small broad based left paracentral disc herniation at C6-C7 causing mild left ventral flattening of the thecal sac and cord without central canal stenosis and mild disc bulge and spurring at C4-C5 resulting in moderate right C5 foraminal encroachment. (Tr. 411). An MRI of the lumbar spine taken that same day showed post-operative changes at the L4-5 level; subtle annular tear with enhancement associated with disc

3

bulge abutting the L4 dorsal root ganglion and exiting neural element without significant displacement; mild facet arthropathy at the L4-5 level bilaterally; and minimal broad based central disc protrusion at L5-S1 and annular tear abutting but not displacing the S1 traversing nerve roots. (Tr. 412).

Plaintiff was examined by a pain management specialist, Hammann Akbik, M.D., in January 2007. (Tr. 453-60). Examination revealed that plaintiff was obese and extremely "deconditioned," but she was able to move and function independently and had good range of motion in the lumbar spine. (Tr. 453, 457). Plaintiff was 62 inches tall and weighed 250 pounds. (Tr. 455). Plaintiff had no motor, sensory, or deep tendon reflex deficits. (Tr. 453). Dr. Akbik reported "exacerbated" pain behavior upon examination of her back. *Id.* Dr. Akbik "had a long discussion" with plaintiff, recommending that she stop smoking marijuana and tobacco, lose weight, and participate in aquatic therapy and land therapy. *Id.* Plaintiff reported that she bought pain medication (Oxycontin and morphine) from her friends. (Tr. 459-60). Dr. Akbik noted that plaintiff was "a poor historian" and he refused to prescribe her opioids due to her "exacerbated behavior and her continuous requests for medications." (Tr. 453, 459).

On January 24, 2007, non-examining state agency physician, Elizabeth Das, M.D., reviewed the record and adopted the residual functional capacity (RFC) from the previous ALJ decision dated March 23, 2006. (Tr. 461-68). Dr. Das opined that plaintiff could perform sedentary work, so long as she never climbed ladders, scaffolds, or ropes, and only occasionally balanced, stooped, kneeled, crouched, crawled, and climbed stairs and ramps. Dr. Das found that the severity or duration of symptoms was disproportionate to the expected severity or expected duration on the basis of plaintiff's medically determinable impairments, but also reported that

4

plaintiff's statements concerning the severity of the symptoms and their alleged affect on her functioning was credible.  (Tr. 466).

On June 27, 2007, non-examining agency physician, Edmond Gardner, M.D., completed an RFC assessment and noted that it was an adoption of the ALJ's RFC formulation dated March 23, 2006, adopted under AR 98-4 (*Drummond* Ruling).  (Tr. 492-99).  Dr. Gardner opined that plaintiff could lift, carry, push, or pull 10 pounds occasionally and 5 pounds frequently.  *Id.*  He indicated she could stand/walk 2 hours in an 8 hour day, at 15 minute intervals.  *Id.*  He indicated she could sit 8 hours at intervals of one hour.  *Id.*  Dr. Gardner indicated that after each hour of sitting plaintiff must stand for up to 3 minutes to stretch to relieve pain and stiffness.  *Id.*  Dr. Gardner also concluded plaintiff should never crawl, kneel, or climb ladders, scaffolds, or ropes, but she could occasionally balance, stoop, crouch, and climb stairs and ramps.  (Tr. 493-94).

On July 12, 2007, plaintiff injured her right fifth toe when she kicked a couch.  An x-ray revealed an old fracture in her toe that had not completely healed; however, upon exam, plaintiff had full range of motion in her foot, with normal neurological and sensory function.  Plaintiff was given a prescription for Percocet medication for pain.  On July 26, 2007, plaintiff complained of "a tremendous amount of pain, soreness and discomfort" in her right knee.  An MRI of her right knee showed damage to the cartilage in the knee, and arthroscopic surgery was recommended due to plaintiff's previous experience of 100% relief with arthroscopic surgery to her left knee.  (Tr. 507).

In August 2007, plaintiff underwent arthroscopic surgery to her right knee.  (Tr. 501). In September 2007, her recovery was progressing with little swelling and "okay" movement and physical therapy was recommended.  (Tr. 509).  In April 2008, plaintiff reported to her psychiatric care provider that the knee surgery reduced much of her pain.  (Tr. 517).

5

In May 2008, plaintiff reported to Dr. Hill that epidural injections in her cervical spine provided pain relief in her back, but she also had shoulder pain. Dr. Hill ordered an MRI which showed mild to moderate arthritis in her right shoulder and moderate to severe arthritis in her left with a tremendous amount of impingement in the subacromial space, but no evidence of any muscle tears. (Tr. 511, 607). Left shoulder surgery was performed and on June 19, 2008, plaintiff reported that her left shoulder was doing well. She was started on formal physical therapy and given a two month prescription for Vicodin. *Id.* By August 2008, plaintiff was "improving on a regular basis." *Id.* She had successfully completed physical therapy and was told "to exercise as much as possible," and was given prescriptions for Naprosyn and Vicodin. *Id.*

On September 25, 2008, plaintiff reported "having a lot of pain, soreness and discomfort. She claims it is from her hip." Examination revealed extreme tenderness and spasm at the sacroiliac joint. She was able to heel and toe walk, she had full sensation, no neurological deficits, and x-rays showed no abnormalities. She was referred to a pain center. (Tr. 608).

An EMG performed on November 5, 2008 showed evidence of a moderate left carpal tunnel syndrome. (Tr. 612-13). On November 6, 2008, plaintiff underwent a lumbar epidural steroid injection at the L2-L3 level. (Tr. 610-11). On November 18, 2008, plaintiff underwent release transverse carpal ligament and tenosynovectomy to her left wrist. (Tr. 614).

An MRI of the cervical spine performed on January 16, 2009 showed small to moderate left paracentral disc protrusion at C6-7, causing mild ventral cord flattening, not significantly changed since the prior exam dated October 24, 2006. (Tr. 633). An MRI of the lumbar spine performed that same day showed evidence of prior surgery at L4-5 and minimal central disc

6

protrusion at L5-S1, smaller than on the prior exam of October 24, 2006 and without associated nerve root displacement or central canal compromise. (Tr. 634).

Plaintiff had cervical steroid injections in March and May 2009. (Tr. 648, 650). Plaintiff had right shoulder surgery in May 2009. (Tr. 658). In July 2009, Dr. Hill reported that plaintiff's shoulder appeared to be doing well. (Tr. 657). Plaintiff had no problems, a good range of motion, and finished physical therapy. *Id*. Plaintiff's right knee was continuing to cause problems and her back pain was worsening. *Id*. Dr. Hill believed that plaintiff's right knee and back were causing her some arthritis. *Id*. Plaintiff asked Dr. Hill to fill out a form stating she was unemployable, but he instead recommended a functional capacity evaluation be scheduled. *Id*. There is no functional capacity evaluation in the record.

### B. Mental Impairments

In January 2004, plaintiff was seen by David Chiappone, Ph.D., a consultative psychologist, for an evaluation. (Tr. 258-61). Following a mental status examination, Dr. Chiappone observed that plaintiff could understand simple one and two step instructions. (Tr. 260). He opined that plaintiff was mildly impaired in her ability to relate to co-workers, supervisors and the public. (Tr. 261). He found her ability to carry out and persist over time would be moderately impaired. *Id*. Dr. Chiappone concluded that plaintiff functioned "fairly adequately" despite his diagnosis that she suffered from "a pain disorder due to psychological condition (depression) and general medical condition." (Tr. 260-61). Dr. Chiappone assigned a Global Assessment of Functioning (GAF) score of 58.[2] (Tr. 261).

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of

In July 2006, Julie Renner, M.D., plaintiff's treating psychiatrist, noted that plaintiff was cooperative, and had normal thought processes, no psychosis, no suicidal or homicidal ideation, a "bright affect," a "pretty good" mood, intact cognition, and some insight and judgment. (Tr. 388-90). Plaintiff returned in October with no change in mood noted. (Tr. 386-87).

On November 8, 2006, Dr. Reyes, plaintiff's treating primary care physician, reported that plaintiff was well-kempt, alert, oriented, and had a good flow of conversation. (Tr. 416-19). According to Dr. Reyes, plaintiff's mood and affect were not depressed, she did not observe signs of anxiety, and plaintiff's insight and judgment, as well as cognitive functioning and concentration, were unimpaired. (Tr. 417).

On December 2, 2006, Dr. Renner completed a form for disability purposes. (Tr. 425-32). Dr. Renner diagnosed plaintiff with major depression and noted her surgical history for her knees, ovarian cysts, osteoarthritis, and chronic back pain. (Tr. 426). Dr. Renner reported that her diagnosis was based on plaintiff's symptoms, including her inability to get out of bed due to depressed mood, frequent crying spells, and feelings of anger and helplessness, which became chronic after her work injury. *Id.* Dr. Renner opined that "due to [plaintiff's] ongoing chronic stressors and due to physical disorders, including those requiring surgery, as well as mental disorders, [plaintiff] most likely would not be able to sustain gainful employment." (Tr. 427). Dr. Renner further opined that plaintiff was not able to remember, understand, and follow complex directions and would have impairments with other directions due to stress. (Tr. 429). She also opined that plaintiff had no substance abuse problems, but had trouble in daily functions despite being compliant with treatment and coming to scheduled appointments. (Tr. 428, 432).

---

severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.* at 32.

With respect to plaintiff's daily activities, Dr. Renner reported that plaintiff's mood was easily stressed and aggravated and her affect was irritated. (Tr. 428). Further, Dr. Renner noted that plaintiff constantly worried about financial stressors and her anxiety presented as irritability and aggravation. *Id.* Dr. Renner reported that plaintiff's cognitive functioning and concentration was impaired by stress, but that she was of average intelligence. *Id.* Regarding social interaction, Dr. Renner noted that plaintiff was easily aggravated and stressed and would then become verbally aggressive. (Tr. 429). Dr. Renner indicated that plaintiff's ability to adapt was impaired due to chronic stress. *Id.* Dr. Renner opined that plaintiff would decompensate with irritability, aggravation, and verbal aggression as a reaction to pressure involved in simple and routine, or repetitive tasks. *Id.*

Non-examining agency psychologist, Steven Meyer, Ph.D., reviewed the file in January 2007. (Tr. 433-52). Dr. Meyer concluded that plaintiff had the mental RFC to perform jobs consistent with the mental limitations provided by the prior ALJ's decision. (Tr. 433, 434, 448). Dr. Meyer opined that plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 444). Dr. Meyer also opined that plaintiff should be restricted to simple, routine work, performed with no fast paced production requirements, and few changes in the workplace setting. (Tr. 433).

In April 2007, Dr. Renner reported that plaintiff's mental health was stable and no change in medication or treatment was needed. (Tr. 533-34).

On April 27, 2007, Dr. Renner completed a Mental Impairment Questionnaire on plaintiff's behalf. (Tr. 472-77). Dr. Renner reported that she saw plaintiff once every two months under the diagnosis of chronic recurrent major depressive disorder and with the highest

9

GAF score in the past year of 45.[3] (Tr. 472).  Dr. Renner opined that plaintiff was unable to

meet competitive standards with respect to the ability to complete a normal work day and work

week without interruptions from psychologically based symptoms.  (Tr. 474).  According to Dr.

Renner, plaintiff had no useful ability to function with respect to the ability to perform at a

consistent pace without an unreasonable number and length of rest periods and the ability to deal

with normal work stress.  *Id*.  Dr. Renner indicated that plaintiff had no ability to understand and

remember detailed instructions and had extreme limitations with respect to restriction of

activities of daily living, difficulties maintaining social functioning, and difficulties in

maintaining concentration, persistence or pace.  (Tr. 474-75).  Dr. Renner noted that plaintiff had

limited but satisfactory abilities to interact with the general public, maintain socially appropriate

behavior, adhere to basic standards of neatness, and travel in unfamiliar places, but also reported

that plaintiff was extremely limited in her ability to maintain social functioning, noting that she

"can't do anything social."  (Tr. 475).  Dr. Renner further indicated that plaintiff had a residual

disease process that had resulted in such marginal adjustment that even a minimal increase in

mental demands or change in the environment would be predicted to cause her to decompensate.

(Tr. 476).  Dr. Renner estimated that plaintiff would miss more than 4 days of work per month as

a result of her impairments or treatment.  (Tr. 477).  Dr. Renner reported that plaintiff was not a

malingerer but noted that she may become belligerent and hostile if others don't understand or

perceive her stress, depression, and fatigue.  *Id*.  Dr. Renner also opined that plaintiff was

capable of managing benefits in her own best interest.  *Id*.

---

[3] The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious symptoms or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) . . . ."  See DSM-IV at 32.

Dr. Renner also completed a psychiatric evaluation form for affective disorders on plaintiff's behalf on April 27, 2007. (Tr. 478-84). Dr. Renner indicated that plaintiff's depressive syndrome was characterized by loss of interest in activities, sleep disturbance, decreased energy, feelings of worthlessness, and appetite disturbance noting that plaintiff had no appetite but that her weight increased with decreased activity. (Tr. 478). Dr. Renner opined that plaintiff had moderate impairments in grooming and personal hygiene and marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace and, further, had extreme difficulties with the following daily living activities: maintenance; shopping; cooking; and cleaning. (Tr. 479, 481). According to Dr. Renner, plaintiff also had marked or extreme difficulty in the following areas of social functioning: getting along with neighbors; getting along with strangers; ability to initiate social contact; responding to supervision; responding to those in authority; establishing interpersonal relationships; holding a job; avoiding eviction; and interacting and actively participating in groups. (Tr. 481-82). Dr. Renner indicated that plaintiff had, either continuously or intermittently, displayed the following behavior in stressful circumstances: withdrawal from situations; exacerbation of signs of illness; exacerbation of symptoms of illness; deterioration from level of functioning; superficial or inappropriate interactions with peers; inability to cope with schedules; poor decision making; and inability to adapt to changing demands. (Tr. 482-83). Dr. Renner also noted that plaintiff had frequent episodes of decompensation which were of short duration. (Tr. 483). Dr. Renner reported that plaintiff's medication, Seroquel, caused drowsiness, fatigue, and lethargy. (Tr. 484).

When seen by Dr. Renner on May 26, 2007, plaintiff reported that she had not had

11

any psychiatric inpatient hospitalizations, and she was afraid of psychiatric impatient units, psychiatric patients, and their implications. (Tr. 530-31). Plaintiff reported that she would rather improve than commit suicide. (Tr. 530). Plaintiff also reported constipation and urinary frequency as side effects from her medication. *Id.* It was further noted that plaintiff's sleep was improved since she quit using caffeine. *Id.* Dr. Renner completed a disability questionnaire that same day wherein she indicated that plaintiff became easily irritable and fatigued. (Tr. 487). Dr. Renner further reported that plaintiff's irritability may disrupt relationships and her chronic fatigue and chronic pain made it unlikely to sustain gainful employment. *Id.*

In August 2007, Dr. Renner noted plaintiff's mood to be "subtly irritable, demanding & entitled as usual," though plaintiff's health and treatment remained stable. (Tr. 525-26). In January 2008, Dr. Renner noted that plaintiff had appropriate mood and affect, clear thoughts, good dress, hygiene, and eye contact, and was cooperative. (Tr. 519). In June 2008, plaintiff reported an increase in appetite due to depression but also reported that her depression symptoms had diminished with medication and described feeling "more of a sense of peace and confidence." (Tr. 516). Plaintiff was noted as being well groomed, maintaining good eye contact, and oriented to person, place, and time. *Id*. Plaintiff saw a social worker on July 10, 2008, who noted that plaintiff was tearful and in a depressed mood during their session. (Tr. 513). Plaintiff became tearful and expressed that she was feeling hopeless, weary, tired, depressed, and emotionally heavy, noting her personal concerns regarding her husband's physical health problems. *Id.* Counseling services were recommended to assist her in reducing depression and personal stressors, but plaintiff rejected that idea and said "she did not need to be linked or referred to any other community service." *Id.* She reported that "her medications were

working over-time," and she experienced no side effects from them. *Id.* The social worker noted that plaintiff's "treatment progress is on target." *Id.*

On July 10, 2008, Dr. Renner completed a form at the request of the Butler County Department of Job and Family Services wherein she diagnosed plaintiff with major depression, chronic, recurrent. (Tr. 536). Dr. Renner stated that plaintiff was unable to do any work at that time, including classroom work. *Id.* Dr. Renner noted that plaintiff was restricted from work because she cannot sit, stand, or bend due to 4 bulging discs in her back. *Id.* According to Dr. Renner, plaintiff was expected to be able to return to work/school on January 12, 2009. *Id.*

On November 10, 2008, Jocelyn Newby, plaintiff's case worker, and Dr. Renner completed a mental impairment questionnaire on plaintiff's behalf. (Tr. 618-23). Dr. Renner reported that plaintiff had extreme limitations in activities of daily living, social functioning, and maintaining concentration, pace, or persistence. (Tr. 621). Dr. Renner also found that plaintiff had recurrent severe panic attacks, and opined that plaintiff's back pain limited her social activities, and that she was dealing with "serious psych medical side effects." (Tr. 619, 621, 623). Dr. Renner concluded that plaintiff would miss more than four days of work per month as a result of her impairments or treatment. (Tr. 623).

On January 13, 2009, Dr. Renner completed another psychiatric evaluation form on plaintiff's behalf. (Tr. 624-29). Dr. Renner reported that plaintiff had marked difficulties with respect to cleaning, paying bills, and initiating and participating in activities independent of supervision and direction. (Tr. 627). Dr. Renner indicated that plaintiff had extreme difficulties with respect to maintenance, shopping, cooking, and using public transportation. *Id.* Dr. Renner noted that plaintiff had marked difficulty initiating social contact and establishing personal

13

relationships. *Id.* Dr. Renner opined that plaintiff had marked difficulty with independent functioning, concentration, persistence in tasks, and sustaining tasks without undue interruption and distractions. (Tr. 628). Dr. Renner further opined that plaintiff had extreme difficulty with the ability to complete tasks in a timely manner, to assume and increase mental demands associated with competitive work, and to sustain tasks without an unreasonable number of breaks or rest periods. *Id.*

When seen by a nurse on March 3, 2009, plaintiff reported that her appetite and sleeping were good, her current medications were working well, and there was a reduction in her depressive symptoms. (Tr. 636-37).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

14

3) If the claimant has a severe impairment(s) that meets or equals one of the
listings in Appendix 1 to Subpart P of the regulations and meets the duration
requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her
past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not
disabled.  If the claimant cannot make an adjustment to other work, the claimant
is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a) (4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four

steps of the sequential evaluation process.  *Id.*; *Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

## B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through
June 30, 2010.

2. The claimant has not engaged in substantial gainful activity since August 25,
2006, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease
of the cervical and lumbar spines, obesity, osteoarthritis of the bilateral knees,
osteoarthritis of the bilateral shoulders, status post left carpal tunnel release

15

surgery, diabetes mellitus, status post fracture of the right 5th toe, major depressive disorder, and polysubstance abuse (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can stand and/or walk for 2 hours per 8-hour workday, for 15 minutes at a time; and she can sit for 6 hours per 8-hour workday for 1 hour at a time followed by a 3 minute period of standing/stretching. The claimant can never climb ladders/ropes/scaffolds, kneel, or crawl. She can occasionally stoop, climb ramps or stairs, balance, or crouch and can frequently reach, or reach overhead. The claimant must avoid all exposure to unprotected heights and use of moving machinery. The claimant can do work limited to simple, routine, and repetitive tasks; in a low stress environment defined as free of fast paced production requirements; involving only simple, work related decisions; and with few, if any, work place changes.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7. The claimant . . . was 42 years old, which is defined as a younger individual age 45-49, on the alleged onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1563).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2006 through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. 12-22).

16

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ' s decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

17

## D.  Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in his assessment of the opinion of

plaintiff's treating physician in violation of 20 CFR 404.1527(d) and Social Security Ruling 96-

2p (1996); (2) the ALJ's physical RFC assessment is not supported by substantial evidence; (3)

the ALJ's credibility assessment is not supported by substantial evidence; (4) the ALJ erred by

relying on an improper hypothetical to the vocational expert; and (5) the ALJ erred in relying

upon testimony of the vocational expert that contradicted the Dictionary of Occupational Titles.[4]

1.  <u>The ALJ did not err in weighing the medical opinions of record or in discounting the opinion of plaintiff's treating psychiatrist, Dr. Renner.</u>

Plaintiff contends the ALJ erroneously discounted the opinion of Dr. Renner, her treating

psychiatrist, because Dr. Renner regularly treated her and consistently reported that plaintiff's

mental impairments precluded her from maintaining full-time employment.  Plaintiff further

asserts the ALJ erred by giving greater weight to the opinions of Dr. Chiappone, a consultative

examiner, and Dr. Meyer, the non-examining state agency psychologist, as their opinions were

remote and based on an incomplete medical record.  For the following reasons, plaintiff's first

assignment of error is not well-taken and should be overruled.

"In general, the opinions of treating physicians are accorded greater weight than those of

physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525,

529-30 (6th Cir. 1997).  Likewise, a treating physician's opinion is entitled to weight

---

[4] Plaintiff's Statement of Errors identifies five specific errors but plaintiff has only provided arguments in support of four of the identified errors.  Plaintiff provided no argument in support of her fourth assignment of error - that the ALJ erred by relying on an improper hypothetical to the vocational expert. *See* Doc. 15, pp. 1-2. Accordingly, this Report and Recommendation will only address the four asserted errors which have been briefed by plaintiff.

substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Sec'y of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Sec'y of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walters*, 127 F.3d at 529; *Shelman*, 821 F.2d at 321.

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source,

19

how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

Dr. Renner treated plaintiff from July 2006 to August 2009. Dr. Renner provided several mental health assessment forms for purposes of plaintiff's disability claim. (Tr. 385-98, 425-32, 617-30, 635-45, 664-78). Throughout the relevant time period, Dr. Renner opined that: (1) plaintiff was unable to sustain employment due to chronic stress and physical and mental disorders (Tr. 426); (2) plaintiff would not be able to complete a normal work day or week due to psychologically based symptoms (Tr. 474); (3) plaintiff had marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and extreme difficulties with activities of daily living (Tr. 477-81, 619, 621, 623); (4) plaintiff's chronic fatigue made the possibility of her engaging in full-time employment unlikely (Tr. 487); and (5) plaintiff could not work due to physical limitations. (Tr. 536).

The ALJ gave "little weight" to Dr. Renner's opinions citing internal inconsistencies between her treatment notes and the opinions expressed in her evaluations, as well as external contradictions with plaintiff's testimony and other evidence of record. Further, the ALJ noted

that Dr. Renner had interwoven plaintiff's subjective reports of her physical impairments into her opinions regarding plaintiff's mental health.  The ALJ explained that Dr. Renner's opinions in this regard were not within the purview of her treatment with plaintiff as Dr. Renner is a specialist in mental health treatment.

The ALJ's decision to afford "little weight" to Dr. Renner's opinion is supported by substantial evidence.  The ALJ reasonably determined that Dr. Renner's opinions on the severity of plaintiff's impairments were inconsistent with her treatment notes.  Dr. Renner's treatment notes indicated that plaintiff was doing well in July and October 2006.  *See* Tr. 388-90 (in July 2006 Dr. Renner observed that plaintiff was cooperative, and had a "bright affect," a "pretty good" mood, intact cognition, some insight and judgment, and normal thought processes); Tr. 386-87 (plaintiff's mood had not changed in October 2006).  Yet, Dr. Renner's December 2006 evaluation form reflected symptoms that were not included in her July or October 2006 treatment notes and included an opinion that plaintiff was unable to work due to major depression, chronic stress, and psychological and physical disorders.  (Tr. 426).  The ALJ also noted inconsistencies between the April 27, 2007 treatment notes, which indicate that plaintiff was stable and required no change in medication (Tr. 533-34) and evaluation forms completed by Dr. Renner that same day in which she opined that plaintiff had extreme functional limitations that precluded her ability to work, was hostile and belligerent, and experienced negative side effects from medication.  (Tr. 472-76).  Dr. Renner also opined that plaintiff has marked difficulties with activities such as paying bills (Tr. 627), but then opined that plaintiff was capable of managing her own benefits.  (Tr. 477).  Dr. Renner's May 2007 evaluation described plaintiff as unable to

get out of bed due to severe depression and being prone to crying and anger spells (Tr. 486, 488),

while August 2007 treatment notes indicate that plaintiff's affect was subtly irritable, demanding,

and entitled as usual. (Tr. 525-26). In November 2008, Dr. Renner noted that plaintiff had

"serious psych medication side effects" (Tr. 623), but 2008 and 2009 treatment notes indicate

that plaintiff was doing well on medication and had no side effects. *See* Tr. 513, 516 (in June

and July 2008 plaintiff declined additional counseling); Tr. 517 (plaintiff reported she was stable

on her medication in April 2008); Tr. 519 (in January 2008 plaintiff reported "no problems with

her medications"); Tr. 636 (in March 2009 plaintiff reported that her medications were working

well for her and she felt stable and was noted as being very pleasant); Tr. 666-71 (May, July, and

August 2009 treatment notes demonstrate that plaintiff was stable on her medications and

reported no side effects). Further, in June 2008 plaintiff reported that her depression symptoms

had diminished with her medication and that she was "living with more of a sense of peace and

confidence." (Tr. 516).

  The ALJ also cited to the inconsistencies between Dr. Renner's treatment notes and

plaintiff's testimony and other record evidence. Dr. Renner reported that plaintiff had recurrent

severe panic attacks at least once a week (Tr. 619), but plaintiff testified that she has never had a

panic attack. (Tr. 50). Dr. Renner's observations and opinions regarding plaintiff's severe

depression and chronic stress are also undermined by plaintiff's rejection of counseling services

intended to help her reduce her depression and stress. (Tr. 513). In addition, Dr. Renner noted

that plaintiff had no substance abuse issues (Tr. 428), but the record demonstrates that in January

2007 plaintiff was dependant on marijuana and opioids. (Tr. 453). Further, in November 2006,

Dr. Reyes found that plaintiff was not depressed, well-kempt, and had no impairments to her cognitive function (Tr. 417), but one month later Dr. Renner opined that plaintiff's depression and psychological impairments were so severe she was unable to work. (Tr. 426-27).  Also, as noted by the ALJ, Dr. Renner's opinion is contradicted by the opinion of the non-examining state agency psychologist, Dr. Meyer, who opined that plaintiff had no more than moderate difficulties in maintaining social functioning and concentration, persistence or pace (Tr. 444) and the opinion of the consultative examiner, Dr. Chiappone, who opined that plaintiff had no marked restrictions and could adequately function despite her psychological condition.  (Tr. 260-61).

It is the Commissioner's function to resolve conflicts in the medical evidence. *Felisky*, 35 F.3d at 1036 (6th Cir. 1994); *Hardaway v. Sec'y of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).  The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently.  *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Sec'y of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990).  Substantial evidence supports the ALJ's determination to afford "little weight" to Dr. Renner's opinion on the ground of inconsistency, regardless of how plaintiff or the Court would have resolved the conflict. *See Kinsella*, 708 F.2d at 1059.

With respect to Dr. Renner's opinion that the combined effects of plaintiff's physical and mental impairments increase the severity of her mental impairments, thus causing plaintiff to be

incapable of performing full-time work, plaintiff argues that the ALJ improperly assessed this opinion when he stated the following:

> Dr. Renner also has interwoven the [plaintiff]'s subjectively reported physical problems into her statements, although she did not treat [plaintiff] for these. She also indicated that some of the limitations she cited are due to physical impairments, making it difficult to separate out limitations allegedly caused by mental impairments. While Dr. Renner's opinion that chronic pain exacerbates [plaintiff]'s depression is reasonable, the specific restrictions she has attributed to back, knee, and shoulder problems are not within the purview of Dr. Renner's treatment. The abstracts Dr. Renner provided, reportedly describing the claimant's symptoms, also are inconsistent with the treatment notes.

(Tr. 20-21).

The record includes several instances where Dr. Renner opined that plaintiff's physical impairments had a negative effect on her mental impairments. *See* Tr. 427 ("Due to this patient's susceptibility to her many ongoing chronic stressors due to physical disorders, including those requiring surgery, as well as mental disorders most likely she would not be able to sustain gainful employment."); Tr. 472 (with respect to plaintiff's prognosis Dr. Renner reported "chronic mood, mental [and] physical impairments some of which can be stabilized."); Tr. 621 ("Back pain limits social activities . . . pain in back feeds to depression."); Tr. 623 ("deteriorating medical conditions interacting with chronic depression to result in downward spiral[.]"). The undersigned agrees with plaintiff that the above statements are not medical opinions regarding plaintiff's physical conditions, but rather reflect Dr. Renner's opinion that plaintiff's pain and physical impairments negatively affect her mental condition. While Dr. Renner's records are not entirely clear as to the source of her information, it appears that Dr. Renner was merely crediting

24

plaintiff's subjective complaints as opposed to improperly opining how plaintiff is limited by her physical conditions.[5]

Nevertheless, the ALJ did not discount Dr. Renner's opinion on the basis alone.  Rather, the ALJ gave "good reasons" for discounting Dr. Renner's opinions by citing their internal and external inconsistencies and contradictions.  *See Drumm v. Astrue*, No. 3:09-cv-62, 2010 WL 1258082, at *7 (S.D. Ohio Feb. 19, 2010) (Report and Recommendation), *adopted*, 2010 WL 1258221 (S.D. Ohio Mar. 26, 2010) (ALJ not required to give treating physician controlling, or even great, weight where doctor's opinions were internally inconsistent and unsupported).  *See also Wilson*, 378 F.3d at 544 (ALJ not required to give treating source opinion most weight where it is "inconsistent with other substantial evidence in [the] case record."); *see also* SSR 96-2p ("controlling weight may not be given to [a medical source] opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record.").  Accordingly, the ALJ's decision complies with agency regulations, is supported by substantial evidence, and should not be disturbed.  *See* 20 C.F.R. 404.1527(d)(2); *Kinsella*, 708 F.2d at 1059.

In her reply brief, plaintiff argues that the ALJ erred by failing to address Dr. Renner's opinion that plaintiff has "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."  (Tr. 476).  However, plaintiff did not raise this issue in her Statement of Errors and may not raise new issues for the first time in her

---

[5] The Court also notes that Dr. Renner is a medical doctor, not a psychologist or social worker.  Thus, while her specialty area is psychiatry, as a medical doctor she is ostensibly qualified to observe and report on plaintiff's physical impairments, especially as they relate to her mental condition.

reply brief. *See Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986). *See also Bishop v. Oakstone Academy*, 477 F. Supp.2d 876, 889 (S.D. Ohio 2007) ("[I]t is well established that a moving party may not raise new issues for the first time in its reply brief."). The Court therefore declines to review any new claims of error raised in plaintiff's reply brief. Further, the record contains no documented instances of episodes of plaintiff's decompensation and neither plaintiff nor Dr. Renner identified any objective or clinical evidence in support of this opinion. Accordingly, any error in not addressing this is harmless and does not justify overturning the ALJ's decision. *See Blakely*, 581 F.3d at 409 (where treating source's opinion is "so patently deficient that the [ALJ] could not possibly credit it," the ALJ's failure to give a reason for according the opinion less weight is harmless error) (citing *Wilson*, 378 F.3d at 547); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993) ("This court has consistently stated that the [ALJ] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

Lastly, with respect to Dr. Renner's opinion that plaintiff is incapable of employment, the Court acknowledges that the ALJ is not required to accept a physician's conclusion that her patient is "unemployable." Whether a person is disabled within the meaning of the Social Security Act is an issue reserved to the Commissioner, and a treating physician's opinion that his patient is disabled is not "giv[en] any special significance." 20 C.F.R. § 404.1527(e). *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted).

26

For the above reasons, the ALJ's determination to afford "little weight" to Dr. Renner's opinion is substantially supported by the record and plaintiff's first assignment of error should be overruled.

    2.   The ALJ's RFC determination is supported by substantial evidence.

Plaintiff argues that the ALJ's RFC determination, which largely adopted the prior RFC assigned by ALJ Jordan, is erroneous because: 1) the ALJ gave great weight to the opinion of Dr. Gardner, a dermatologist, regarding plaintiff's physical abilities; 2) there was no medical source opinion in the record regarding the October 2006 MRIs of plaintiff's spine, nor were these MRIs considered by Dr. Gardner or ALJ Jordan; and 3) ALJ Flynn, ALJ Jordan, and Dr. Gardner all failed to address the impact of plaintiff's obesity as required by SSR 02-1p.  In response, the Commissioner contends that the RFC determination is substantially supported as the ALJ specifically considered the October 2006 MRIs, which showed only mild abnormalities, and the record demonstrates that the ALJ sufficiently considered plaintiff's obesity.  For the following reasons, the undersigned finds that the ALJ's RFC determination is substantially supported by the record and recommends that plaintiff's second assignment of error be overruled.

With respect to plaintiff's first argument, plaintiff has provided no support for her inference that Dr. Gardner, due to his specialty area in dermatology, is unqualified to provide a medical opinion as how plaintiff's physical impairments limit her physically.  The regulations simply provide that an ALJ will "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. 404.1527(d)(5).  Here, the only medical opinions regarding plaintiff's

27

physical RFC are those of Dr. Das[6] and Dr. Gardner, both non-examining state agency physicians. Both doctors adopted the RFC formulated by ALJ Jordan, which provides that plaintiff has the ability to do sedentary work with some restrictions. Dr. Gardner's opinion included further accommodations for plaintiff to address her pain and stiffness, such as allowing her to stand for up to three minutes once an hour to stretch and restricting her to no crawling or kneeling. As plaintiff presented no medical opinion refuting these RFC assessments and no authority to support her argument that Dr. Gardner's opinion is lacking due to his specialization area, the Court finds this argument without merit.

Second, plaintiff argues that neither ALJ Jordan (in the previous administrative proceeding) nor Dr. Gardner reviewed plaintiff's October 2006 MRIs in assessing plaintiff's RFC and, therefore, the RFC formulated by ALJ Flynn which is based thereon is flawed. However, ALJ Flynn explicitly considered the October 2006 MRI findings in determining plaintiff's RFC, as well as the 2009 MRI of plaintiff's cervical and lumbar spine which demonstrated no significant changes since 2006. (Tr. 16-17). The 2009 MRIs showed mild cervical disc degeneration, cervical alignment within the normal range, and well preserved disc space height throughout the lumbar region. (Tr. 633-34). Both the 2006 and 2009 MRIs demonstrate mild, and at most moderate, abnormalities. Notably, there is no medical opinion in the record that the conditions reflected in the MRI findings limit plaintiff in ways not accommodated by the ALJ's RFC. Plaintiff has not met her burden of presenting objective and/or clinical evidence that her back and neck impairments functionally limit her abilities to

---

[6] The record does not specify Dr. Das' specialty area.

engage in work activities in ways not addressed by the ALJ's RFC determination. *See McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680, at *5 (6th Cir. May 19, 2000) ("The mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual.") (citing *Foster v. Bowen*, 853 F.2d 488, 489 (6th Cir. 1988)).

Third, plaintiff similarly argues that ALJ Jordan and Dr. Gardner failed to consider the impact of plaintiff's obesity on her functional abilities and because ALJ Flynn's RFC is based thereon, his determination fails to adhere to the requirements of Social Security Ruling 02-1p. SSR 02-1p provides that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p. Adjudicators must "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." *Id.*

The record contains several notations from various treating doctors that plaintiff's weight ranged from 250 to 264.4 pounds (Tr. 455, 566, 568, 571, 652) as well as doctor's instructions that she lose weight (Tr. 453, 566), but there is no medical opinion regarding the effects of plaintiff's obesity on her functional abilities. In fact, the notes from Dr. Akbik indicate that plaintiff's obesity did not significantly affect her physically. *See* Tr. 452 (January 20, 2007 treatment note provides that "patient is obese, extremely deconditioned, but she was able to have good range of motion in the lumbar spine."). While plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence because he failed to address the impact of

her obesity, she has not suggested any additional limitations the ALJ should have imposed based on her obesity.  Nor has plaintiff directed the Court's attention to any evidence of record showing that plaintiff's RFC is affected by her obesity.

Contrary to plaintiff's contention, the ALJ did not ignore plaintiff's obesity impairment. As noted by the Sixth Circuit, it is "a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006).  Rather, Ruling 02-1p simply provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id.* at 418 (quoting S.S.R. 02-1p).

Here, the ALJ specifically determined that plaintiff's obesity was a "severe" impairment. (Tr. 12).  Further, the ALJ considered the treatment notes from Dr. Reyes and Dr. Akbik - the only medical sources who mentioned plaintiff's weight, and credited Dr. Gardner's RFC assessment which considered plaintiff's obesity.  (Tr. 18-19; 492).  *See Bledsoe*, 165 F. App'x at 412 ("[T]he ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity.").  Given the absence of any evidence that plaintiff's obesity has increased the severity of her other limitations, the record demonstrates that the ALJ sufficiently considered plaintiff's obesity in formulating her RFC.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).

As the Court finds plaintiff's arguments regarding the adequacy of the ALJ's RFC determination to be without merit, plaintiff's second assignment of error should be overruled.

3.  The ALJ did not err in finding that plaintiff's subjective reports were not fully
    credible.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of

witnesses, including that of the claimant. *Rogers*, 486 F.3d at 247 (citations omitted).  In light of

the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's

credibility finding is entitled to deference and should not be discarded lightly. *Buxton*, 246 F.3d

at 773; *Kirk*, 667 F.2d at 538.  "If an ALJ rejects a claimant's testimony as incredible, he must

clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The regulations provide that an ALJ must consider certain factors in assessing credibility. *See* 20

C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.[7]

Plaintiff contends that the ALJ erred in failing to fully credit her subjective complaints of

pain and reported limitations.  Plaintiff asserts that the ALJ's credibility assessment is not

substantially supported for the following reasons: (1) the ALJ improperly inferred that plaintiff

was noncompliant with Dr. Hill's instructions that she see a neurosurgeon and that she undergo a

functional capacity evaluation; (2) the ALJ made speculative conclusions that plaintiff was not

forthright about her alleged substance abuse without citing to supporting evidence; and (3) the

ALJ's statements regarding plaintiff's activities of daily living are without support as her

statements are consistent throughout the record.  Plaintiff's arguments are not well-taken.

---

[7] These include factors such as the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

In analyzing Dr. Hill's recommendations, the ALJ stated:

> Dr. Hill has recommended the claimant see a neurosurgeon, but the record does not suggest she followed up on this recommendation. Ultimately, the record does not support the claimant's allegedly worsening pain. No treating physician has opined the claimant is physically disabled. Dr. Hill asked the claimant to have a functional capacity evaluation before he would fill out a report that she is unemployable. The record contains no functional capacity evaluation and no statement from Dr. Hill.

(Tr. 18) (citing Tr. 649, 657).

Plaintiff argues that the ALJ's improperly alluded that she was noncompliant with her medical providers. Contrary to plaintiff's argument, it appears that the ALJ was providing a supporting explanation for his determination that the record does not support plaintiff's claims of worsening pain and contains no opinion that she is physically disabled.

Regardless, even if the ALJ inferred that plaintiff was noncompliant with Dr. Hill's recommendation, this inference relates to plaintiff's failure to obtain a functional capacity evaluation. Plaintiff contends that she did not have enough time between Dr. Hill's July 10, 2009 recommendation and the August 21, 2009 hearing to obtain a functional capacity evaluation. However, plaintiff fails to present any evidence whatsoever that she ever attempted to schedule an evaluation or ask that the record remain open for purposes of such an evaluation. As the ALJ noted, there is no opinion in the record that plaintiff is disabled as a result of her physical impairments. Dr. Hill also stressed the importance of obtaining such an opinion: "[Plaintiff] has asked me to fill out a report stating that she is unemployable and I have recommended that in order to protect her that we set her up for an FCE. *By having the FCE, no one can contest her inability to work*." (Tr. 657) (emphasis added). Clearly, plaintiff was put on

notice that it was of vital importance to her social security claim that she obtain a functional capacity evaluation; yet, she did not. Plaintiff's failure to follow Dr. Hill's strong recommendation supports the ALJ's inference that she was not compliant.

Plaintiff also argues that the ALJ improperly inferred, without providing support, that she was not forthright about her substance abuse. The ALJ noted that "there is evidence that [plaintiff] misuses her prescription medication and other drugs, which raises the question of secondary gain issues in her continuing and escalating pain complaints." (Tr. 18). In support of this statement, the ALJ cited to Dr. Hill's January 2007 treatment notes and other notes which indicated that Dr. Hill was no longer willing to prescribe plaintiff Percocet and that she had a history of asking for early refills of Vicodin, suggesting that she was over-using her medication. *See* Tr. 408 (September 2006 notes that plaintiff's early request for a Percocet refill was denied); Tr. 506 (Dr. Hill's notes that he refused to prescribe plaintiff Percocet); Tr. 509 (treatment notes from Dr. Hill documenting limits placed on plaintiff's Vicodin prescription). In addition, the record contains further evidence that plaintiff has a history of seeking early refills of pain medication and being upset when denied. *See* Tr. 405 (March 2003 notes that plaintiff was upset that her refill for Vicodin was denied); Tr. 407 (November 2003 notes that plaintiff's request for Vicodin refill was denied).

The ALJ also cited to Dr. Akbik's notes from January 20, 2007 which demonstrated that plaintiff was dependent on opioids and other substances, was smoking marijuana, and was illegally purchasing MS Contin or morphine. (Tr. 453). Dr. Akbik recommended against providing plaintiff with opioid prescriptions due to her "exacerbated behavior and repeated

33

requests for medications," and he required a record from her pharmacy of her prescriptions and a urine drug screen. *Id.* Dr. Akbik stated that plaintiff was a poor historian and he believed this was intentional on her part so that she could request medications. As noted by the ALJ, there are no further treatment notes from Dr. Akbik, suggesting that he refused to treat her or that plaintiff opted not to see him again. (Tr. 19). Moreover, the ALJ cited to records from Dr. Reyes which document that plaintiff was very upset when Dr. Akbik prescribed water therapy and a TENS unit as opposed to medications. (Tr. 566).

The ALJ's finding that plaintiff was not forthright about her substance abuse is supported by substantial evidence. Dr. Akbik noted that plaintiff was smoking marijuana and illegally purchasing narcotics; the record demonstrates a history of early refill requests for narcotics medications; and the medical records show that plaintiff became emotionally upset when refused pain medications. Plaintiff's testimony that she never used drugs illegally (Tr. 47) stands in stark contrast to this evidence and her argument that there is no "proof" that she abuses substances ignores such evidence. In light of the inconsistencies between plaintiff's testimony and the medical and other evidence of record, the ALJ's credibility determination is substantially supported. *See Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 546 (6th Cir. 2002) (affirming ALJ's credibility determination where plaintiff's testimony conflicted with medical evidence); *see also* SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

34

Finally, plaintiff argues that ALJ's statements concerning her activities of daily living are "unfounded." (Doc. 15 at 17). However, plaintiff has made no attempt to develop this argument or to direct the Court's attention to the specific portions of the record that allegedly support her argument.

The ALJ properly considered the relevant evidence of record and the requisite factors as set forth in 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p such as plaintiff's treatment history, medications, and her statements regarding the level of pain she experiences and her functional limitations. (Tr. 17-20). Contrary to plaintiff's contentions, the ALJ properly considered plaintiff's subjective complaints in light of the evidence of record and determined that plaintiff was less than fully credible based on the inconsistencies between plaintiff's testimony, the medical evidence, and other evidence of record. Though there is some medical evidence supporting plaintiff's testimony, as the Commissioner has properly considered the evidence and identified inconsistencies in plaintiff's testimony, his credibility determination is substantially supported and should not be disturbed by the Court. *Kinsella*, 708 F.2d 1059. Plaintiff's third assignment of error should be overruled.

    4.  <u>The ALJ did not err by relying on the VE's testimony.</u>

For her final assignment of error, plaintiff argues the ALJ erred by relying on vocational testimony that conflicted with the Dictionary of Occupational Titles (DOT). The hypothetical question the ALJ presented to the VE reflected an individual who was limited to "work that consists of simple, routine and repetitive tasks performed in a low stress environment [defined] as free of fast paced production requirements involving only simple work-related decisions and

with few, if any, workplace changes," as well as other physical limitations.  (Tr. 15, 53).  The VE

testified that such an individual could perform sedentary, unskilled work such as surveillance

system monitor (DOT 379.367-010), clerical support (DOT 249.587-018), and inspector or tester

(DOT 539.485-010).  (Tr. 53-54).  The DOT occupations listed by the VE are coded as

"reasoning level three" jobs.[8]  Reasoning level three jobs require an individual to "[a]pply

commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic

form" and "[d]eal with problems involving several concrete variables in or from standardized

situations."  Dictionary of Occupational Titles, Appendix C, 4th Ed., rev. 1991 (available at

http://www.occupationalinfo.o rg/appendxc_1.html) (last visited January 27, 2012).  Plaintiff's

RFC limits her to reasoning level one work, which involves the application of "commonsense

understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized

situations with occasional or no variables in or from these situations encountered on the job."  *Id*.

Plaintiff argues that the VE's testimony conflicts with the DOT and demonstrates that the ALJ's

decision at step five of the sequential evaluation process is not supported by substantial evidence.

The Court disagrees.

First, the "D.O.T. lists *maximum* requirements of occupations as generally performed, not

the range of requirements of a particular job as it is performed in specific settings."  Social

Security Ruling 00-4p (emphasis added).  In other words, the reasoning levels listed in the DOT

---

[8] *See* DOT 249.587-018 DOCUMENT PREPARER, MICROFILMING (business ser.), DOT 379.367-010
SURVEILLANCE-SYSTEM MONITOR (government ser.), DOT 539.485-010 WEIGHT TESTER (paper & pulp),
(available at http://www.occupationalinfo.org/contents.html) (last visited January 27, 2012).

reflect the maximum requirements for the sedentary jobs listed by the VE, and not the range of

specific requirements an individual must satisfy to perform the jobs. *See, e.g., Hall v. Chater*,

109 F.3d 1255, 1259 (5th Cir. 1997) (not every job identified by a VE will actually "have

requirements identical to or as rigorous as those listed in the D.O.T."). *See also French v.

Astrue*, No. 2:08-cv-15, 2009 WL 151525, at *8 (E.D. Ky. Jan. 20, 2009) ("the DOT defaults to

the highest physical demand level required by the job"). Social Security Ruling 00-4p

recognizes that a VE "may be able to provide more specific information about jobs or

occupations than the DOT." SSR 00-4p. Thus, the ALJ could reasonably rely on the VE's

testimony that plaintiff could perform sedentary, unskilled surveillance system monitor, clerical

support, and inspector or tester jobs to satisfy his burden at step five of the sequential evaluation

process despite the DOT's listing of reasoning level three for such jobs.

Second, even if the Court were to find an apparent conflict between the VE's testimony

and the DOT, the ALJ met his burden of inquiry under SSR 00-4p. The ALJ has a duty under

Social Security Ruling 00-4p to develop the record and ensure there is consistency between the

VE's testimony and the DOT and "inquire on the record, as to whether or not there is such

consistency." SSR 00-4p. Where the ALJ questions the VE and the VE testifies that there is no

conflict with the DOT, the Sixth Circuit has held that the ALJ is under no further obligation to

interrogate the VE, especially where the plaintiff is afforded a full opportunity to cross-examine

the VE. *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009). The ALJ is

only required to develop the record further where the conflict between the DOT and the VE's

testimony is apparent. *Id.*; *see also* SSR 00-4p ("*If* the VE's . . . evidence appears to conflict

with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.")
(emphasis added).

In this case, the ALJ asked the VE if his testimony was consistent with the DOT and the VE responded in the affirmative. (Tr. 56). After the VE responded, the ALJ turned the questioning over to plaintiff's counsel. (*Id.*). Plaintiff's counsel did not question the VE about any apparent inconsistencies between her testimony and the DOT, nor did counsel bring any potential conflicts to the ALJ's attention after the hearing. In fact, plaintiff's counsel declined to ask the VE any questions whatsoever. (Tr. 56). Counsel was afforded a full opportunity to cross-examine the vocational expert and the ALJ had no affirmative duty under SSR 00-4p to conduct his own interrogation of the VE to determine the accuracy of the vocational testimony. *See Lindsley*, 560 F.3d at 606 (citing *Martin v. Commissioner of Social Security*, 170 F. App'x 369, 374 (6th Cir. 2006) ("Nothing in S.S.R. 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.")). Because the ALJ specifically asked the VE if her testimony was consistent with the DOT and the uncontradicted testimony of the vocational expert indicated that no conflict existed, the ALJ did not err by relying on such testimony in finding other jobs plaintiff could perform. *Id.*

Even if the ALJ erred in this regard, such error would be harmless. The VE further testified that in addition to the three jobs she cited, a person with plaintiff's physical and mental abilities would be able to perform "probably 90 percent of all sedentary, unskilled jobs." (Tr. 54). Plaintiff does not challenge the consistency of the VE's testimony with the DOT as it

38

relates any of these sedentary jobs.  The ALJ's reliance on the VE testimony to find plaintiff is

not disabled is supported by substantial vocational evidence and should be affirmed.

Accordingly, plaintiff's fourth assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the

docket of the Court.


Date: 2/2/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DONNA S. JUNG,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-34
Barrett, J.
Litkovitz, M.J.

### NOTICE REGARDING OBJECTION TO REPORT AND RECOMMENDATION

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).